WO                                                                                          JDN

**NOT FOR PUBLICATION**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jorge Herring, a.k.a. George Devon Herring, <br><br> Plaintiff, <br><br> vs. <br><br> Dora B. Schriro, et al., <br><br> Defendants. | No. CV 08-1249-PHX-GMS (DKD) <br><br> **ORDER** |

Plaintiff Jorge Herring brought this civil rights action under 42 U.S.C. § 1983 against various officials from the Arizona Department of Corrections (ADC): (1) former ADC Director Schriro; (2) Facility Health Administrator Richard Pratt; (3) former Deputy Warden Romweber; (4) Lewis Complex Warden David Rivas; and (5) Dr. Ronolfo S. Macabuhay (Doc. #1). Before the Court is Defendants' Motion for Summary Judgment (Doc. #37), to which Plaintiff did not respond.

The Court will grant Defendants' motion and terminate the action.

**I.     Background**

Plaintiff's claim arose during his confinement at the Lewis Prison Complex in Buckeye, Arizona (Doc. #1 at 1). In Count I of his Complaint, Plaintiff alleged that as a result of inadequate security staffing, he was attacked and severely beaten by another inmate (id. at 4). Plaintiff claimed that Schriro, Rivas, and Romweber had knowledge that Plaintiff's housing unit was understaffed and were aware of the safety risks, yet they failed to adequately staff the unit and "turned a blind eye" to the known risk of harm (id. at 4b-4i).

In Count II, Plaintiff alleged that he was denied a medical procedure to repair and realign his nasal passages and, consequently, he suffers from restricted breathing, insufficient air intake, severe migraine headaches, and continuous pain (id. at 5). He asserts that Schriro, Pratt, and Macabuhay were aware of Plaintiff's medical problems but denied the corrective procedures for purely economic reasons (id. at 5b-5f).

Plaintiff sued each Defendant in his or her individual and official capacity, and he requested money damages and injunctive and declaratory relief (id. at 2-2b, 6).

The Court screened the Complaint and ordered Defendants to respond (Doc. #5). Defendants filed their Answer (Doc. ##15, 20), and discovery commenced (Doc. #23). Defendants then submitted their Motion for Summary Judgment (Doc. #37).

## II. Motion for Summary Judgment

### A. Defendants' Contentions

#### *1. Facts*

Defendants submit a separate Statement of Facts (DSOF) (Doc. #38), which is supported by the declarations of each Defendant,[1] a copy of Plaintiff's Arizona Inmate Management System report, and the declaration of Quency Owens, former Associate Deputy Warden at the Lewis Complex (id., Exs. A-E, G). The DSOF sets out the following facts:

At the relevant time, Plaintiff was housed in the close-custody Rast Unit, a protective segregation (PS) unit where inmates are double-bunked, two to a cell (DSOF ¶¶ 16-18). There are 25 cells in a pod, and 8 pods in the Rast Unit (id. ¶ 14). The inmates walk to recreation and chow together (id. ¶ 16). A floor officer is assigned to each pod and has direct contact with the inmates in their cells, and a control officer overlooks the pods from a "bubble"; the control officer operates the opening and closing of cell doors (id. ¶¶ 18-19). The floor officer and the control officer positions are considered "core" posts that must be filled; if they are not filled and staff cannot be moved around to cover these two core posts, then inmate activities are canceled (id. ¶ 24). If an incident arises and additional officers are

---

[1] Defendants submit the declaration of Schriro; however, it is unsigned and therefore will not be considered (Doc. #38, Ex. F).

1    needed, an Incident Management System (IMS) is initiated and backup officers arrive
2    quickly to assist (id. ¶ 20).

3    According to ADC reports, on May 8, 2007, when inmates were returning from recreation to the Rast Unit, inmate Dean went into Plaintiff's cell and hit Plaintiff in the face (DSOF ¶ 12). In response, Plaintiff grabbed an ink pen and stabbed Dean several times (id.). Correctional Officer (CO) II Roberts observed "tussling and punches" between the two inmates and therefore activated the IMS (id.). After the IMS was activated, Dean threw Plaintiff to the ground, kicked him a few times, and then ran up the stairs and into his assigned cell (id). Plaintiff's face was bloody, and upon Macabuhay's order, he was taken to Maricopa Medical Center by ambulance (id.).

    Romweber believes that the Rast Unit was at core posting on May 8, 2007, because the inmates were able to go to recreation (id. ¶ 27).

    Plaintiff filed an inmate grievance claiming that lack of security led to his assault (id. ¶ 41). The response to Plaintiff's grievance concluded that staff were present and responded appropriately to the incident (id. ¶ 42). Plaintiff appealed this response, and Romweber answered that Plaintiff failed to submit an achievable resolution (id. ¶ 44). Plaintiff appealed to Schriro, who delegated authority to respond to the appeal to Susan Rogers, ADC legal counsel (id. ¶ 46). Rogers concluded that Plaintiff's allegation that staff was responsible for the attack was unsubstantiated and she noted that the disciplinary ticket that Plaintiff received for his involvement in the incident was upheld (id. ¶ 46).

    As to the medical-care claim, Macabuhay saw Plaintiff on May 8, 2007, and transferred Plaintiff to the hospital emergency room (id. ¶ 48). The hospital physician noted that Plaintiff's nose was slightly displaced to the right side and he had a nasal fracture and left jaw swelling (id. ¶ 49). The physician recommended that Plaintiff follow-up in the plastics clinic in 2-3 weeks after the swelling subsided, and he recommended Motrin for the pain (id.).

    Plaintiff was returned to ADC and on May 9, 2007, Macabuhay saw Plaintiff for a follow-up appointment; Plaintiff complained of headaches, a sore nose, and the inability to

breathe through his nose (id. ¶ 51). Macabuhay also noted the abnormal shape to Plaintiff's nose (id.). That same day, pursuant to the hospital physician's recommendation, Macabuhay submitted an Outside Consult Request for evaluation for plastic surgery of Plaintiff's nasal fracture; however, Macabuhay did not think that Plaintiff needed surgery (id. ¶ 52). The Request was reviewed by Pratt and forwarded to Central Office, which denied the Request on May 24, 2007 (id. ¶¶ 52-53). In its denial, the Central Office noted that surgery may not be necessary unless Plaintiff's problem does not improve and that a consult for surgery may be submitted at a later time if needed (id. ¶ 53). Macabuhay never resubmitted a surgery consult request because he did not feel that it was necessary since the deviation was just a half centimeter and not enough to cause breathing difficulties (id. ¶ 54). Macabuhay found that allergies and asthma caused Plaintiff's breathing problems and those maladies were treated with appropriate medications (id.).

Macabuhay saw Plaintiff on May 30, July 30, October 9 and 23, and July 15, 2008, in response to Plaintiff's complaints about breathing problems, frequent headaches, wheezing, nose pain, and a subsequent hit on the nose (id. ¶¶ 55, 57, 59, 61, 63). In October 2007, Macabuhay ordered x-rays, which showed a fracture site on the nasal bones (id. ¶ 60). All of Plaintiff's later appointments with Macabuhay concerned medical issues unrelated to his nose (id. ¶ 64).

In June 2007, Plaintiff grieved the denial of surgery and requested a return to the Maricopa Medical Center for follow-up treatment on his nose (id. ¶ 71). Pratt responded to Plaintiff's grievance by advising him to submit a health needs request for treatment of his current condition and that after further examination, a recommendation for follow-up at the hospital would be considered (id. ¶ 72). Plaintiff appealed Pratt's response to Romweber, and then to the Director's level; Schriro delegated authority to Deputy Director Dona Marie Markely to respond to the appeal (id. ¶ 74). The appeal response concluded that surgery to repair a deviated septum is elective and not medically necessary (id.).

### *2. Legal Arguments*

Defendants seek summary judgment on the grounds that (1) Plaintiff was not housed

in conditions that posed an intolerable risk of serious harm, (2) Defendants were not deliberately indifferent to Plaintiff's safety, (3) Defendants were not deliberately indifferent to Plaintiff's medical needs, (4) Plaintiff cannot establish liability for the named Defendants, (5) Plaintiff is not entitled to punitive damages, and (6) Defendants are entitled to qualified immunity (Doc. #37).

**B.    Plaintiff's Response**

On November 17, 2009, the day after Defendants' filed their Motion for Summary Judgment, the Court issued an Order informing Plaintiff of his obligation to respond to the motion (Doc. #39). See Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998). To date, Plaintiff has not filed a response to the summary judgment motion, and the time for responding as expired.

Although there is no response memorandum, Plaintiff's Complaint is verified; therefore, it is treated as an affidavit opposing summary judgment (see Doc. #1 at 5). See Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995); McElyea v. Babbitt, 833 F.2d 196, 197-98 & n. 1 (9th Cir. 1987).

*1. Facts*

In his pleading, Plaintiff alleges the following facts:

On May 8, 2007, there were no COs the pod floor when inmates were returning from recreation (Doc. #1 at 4-4b ¶¶ 2, 5). The unit was understaffed and all the officers were outside of the building (id. at 4b ¶¶ 4-5). There was just one CO in the control room opening cell doors (id. at 4b ¶ 5). The officer in the control room was either unobservant, distracted, or simply not present (id. at 4 ¶ 2). Consequently, an inmate was able to walk into Plaintiff's cell and assault Plaintiff for 3-5 minutes (id. ¶ 3). Plaintiff was severely beaten and he suffered a broken nose, a deviated septum, two black eyes, and numerous contusions and abrasions (id. at 5 ¶ 2).

Plaintiff was transported to the Maricopa County Medical Center, where the treating physician recommended follow-up care and surgery to repair the deviated septum (id. at 5 ¶ 4). That recommended follow-up care, however, was denied, and Plaintiff's breathing

1  problems were and continue to be treated with a nasal spray and medication (id. at 5b-5c
2  ¶¶ 8, 11). These treatments are ineffective, and Plaintiff continues to suffer breathing
3  problems, severe headaches, and sleep deprivation (id. at 5c ¶ 13).

### 2. *Legal Arguments*

Plaintiff contends that his assault and injuries were a direct result of understaffing at his PS unit (id. at 4b ¶¶ 4, 7). He states that PS units house known targets in the prison population, including homosexuals, transsexuals, and young or other vulnerable inmates (id. at 4c ¶ 10). Plaintiff asserts that PS units are therefore required to have adequate funding to staff the unique security needs for these inmates (id. ¶ 11). Plaintiff maintains that Defendants were aware of the special security needs and aware of the risk of harm to inmates absent sufficient security, yet they refused to adequately fund and staff the PS units and to adequately allocate personnel and resources within the prison to maintain security (id. at 4c-4h).

With respect to his medical-care claim, Plaintiff claims that the denial of surgery contradicted the surgeon's recommendations and is based solely on costs (id. at 5d ¶¶ 14-15). He argues that the treatment provided to him by ADC and Macabuhay is wholly ineffective, and Macabuhay simply monitors Plaintiff's continued suffering (id. at 5f ¶ 26).

### III. **Summary Judgment Standard**

A court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). Even where the nonmovant fails to respond to a summary judgment motion, the movant must still affirmatively show the

absence of genuine issue of material fact. Martinez v. Stanford, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

If the movant meets its burden with a properly supported motion, the burden then shifts to the nonmovant to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmovant need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). By affidavit or as otherwise provided by Rule 56, the nonmovant must designate specific facts that show there is a genuine issue for trial. Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076. The nonmovant may not rest upon the pleadings' mere allegations and denials, but must present evidence of specific disputed facts. See Anderson, 477 U.S. at 248.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Id. at 249. In its analysis, the court must believe the nonmovant's evidence, and draw all inferences in the nonmovant's favor. Id. at 255.

**IV.   Count I-Failure to Protect**

   **A.   Legal Standard**

"[P]rison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005) (internal quotations omitted). To prevail on an Eighth Amendment failure-to-protect claim, a plaintiff must demonstrate facts that satisfy a two-part test that shows the defendant was deliberately indifferent. First, the plaintiff must prove that objectively he suffered a sufficiently serious deprivation. Wilson v. Seiter, 501 U.S. 294, 298 (1991). Then, he must prove the subjective element; that the defendant had a culpable state of mind—was deliberately indifferent—in allowing the deprivation to occur. Id. at 299.

A prison official has a sufficiently culpable mind only if he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Gibson v. County of Washoe, 290 F.3d 1175, 1187-88 (9th Cir. 2002). Where an inmate's claim is based on the alleged failure to prevent harm, the inmate may satisfy the "sufficiently serious" requirement by showing the existence of "conditions posing a substantial risk of serious harm" to him. Farmer, 511 U.S. at 834. And to prove knowledge of the risk, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. See id. at 840-41; Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).

**B.    Analysis**

Defendants' initial argument is that Plaintiff was not housed under conditions that posed an intolerable risk of serious harm; therefore, there was no objectively, sufficiently serious deprivation (Doc. #37 at 7-8). Defendants submit that they previously recognized a potential harm to Plaintiff and that is why he was placed in a PS unit (id. at 7). They argue that while the prison setting is unpredictable and potentially dangerous given the nature of those housed in a prison, there is no evidence that there existed a known danger to Plaintiff from inmate attacks (id. at 7-8).

Rivas avers that in May 2007, while she was Warden at the Rast Unit, CO staffing was adequate and there were very few vacancies (Doc. #38, Ex. B, Rivas Decl. ¶ 4). Romweber, who was Deputy Warden at the Rast Unit, explains that in the close-custody PS Rast Unit, inmates are not in solitary confinement and they walk as a group to chow and recreation (id., Ex. C, Romweber Decl. ¶ 21). The floor officer on duty assists in bringing inmates back from chow and recreation and moves inside and outside—back and forth—until all inmates are in their cells (id. ¶ 18). Romweber avers that the shift roster for May 8, 2007, reflects that there were two CO II floor officers—Burston and Escobedo—who accompanied Plaintiff to the hospital after the assault (id. ¶ 17). She further avers that if a problem occurs,

1  an IMS is called and backup officers arrive quickly; in this case, an IMS was initiated by the
2  control officer at approximately 10:33 a.m. and back-up officers arrived on the scene at 10:35
3  a.m. (id. 22; Ex. B, Rivas Decl. ¶ 9).

4  Although Plaintiff alleges the Defendants failed to adequately fund staffing and
5  security for the PS units, he fails to proffer any evidence regarding inadequate funding or to
6  connect the lack of additional officers or security to the assault on May 8, 2007. As
7  Defendants demonstrate, in the close-custody unit where Plaintiff was housed, inmates were
8  not isolated, and they walked in groups to and from chow and other activities. Even if more
9  that 1-2 floor officers were on duty on May 8, there is no evidence to suggest that the assault
10 on Plaintiff could have been anticipated or prevented. Plaintiff does not allege that he was
11 subjected to a specific risk of harm; for example, he does not assert that he had a history of
12 violence with the inmate who attacked him. Rather, Plaintiff alleges that all PS inmates are
13 subject to a risk of harm because they are known targets within the prison population (Doc.
14 #1 at 4c 10). But to meet the objective requirement, Plaintiff must allege that he is *actually*
15 at a substantial risk of harm; his belief that he is at risk or even the "mere threat" of future
16 bodily harm may not provide a basis for a cognizable Eighth Amendment claim. See Gaut
17 v. Sunn, 810 F.2d 923, 925 (9th Cir. 1987).

18 On this record, Plaintiff fails to demonstrate a disputed issue of fact concerning an
19 objectively, sufficiently serious deprivation. See Farmer, 511 U.S. at 834. Without a
20 showing to satisfy the objective prong in the deliberate indifference analysis, Plaintiff cannot
21 withstand summary judgment on his failure-to-protect claim.

22 Even assuming that the first, objective component was met, Plaintiff has not set forth
23 any specific facts demonstrating deliberate indifference by any Defendant. See Leer v
24 Murphy, 844 F.2d 628, 634 (9th Cir. 1988) ("prisoner must set forth specific facts as to each
25 individual defendant's deliberate indifference"). Plaintiff's general allegations—that
26 Defendants knew about staffing and security problems that posed a serious risk to vulnerable
27 inmates and refused to remedy the situation—are insufficient to establish a material factual
28 dispute. See Celotex, 477 U.S. at 324 (nonmovant must "go beyond the pleadings . . . and

designate specific facts showing" a material factual dispute). Further, there is no evidence that Plaintiff complained about a general lack of security or warned any officer or Defendant that the inmate who assaulted him posed a specific threat. Cf. Hearns, 413 F.3d at 1041-42 (inference that prison officials acted with deliberate indifference where they knew that a group of Muslim inmates had previously committed a violent attack against the plaintiff but left the plaintiff unsupervised with those inmates); Berg v. Kincheloe, 794 F.2d 457, 460-61 (9th Cir. 1986) (material factual dispute whether prison official acted with deliberate indifference where inmate told the official that his life was in danger if he reported for work, but the official ignored the inmate's complaint and sent him to work where he was beaten and raped).

To the extent that Plaintiff sues Defendants in their official capacity for a policy of understaffing PS units and improperly allocating resources such that security needs were not met, Plaintiff has failed to demonstrate that the alleged understaffing and May 8, 2007 assault stemmed from a policy or custom. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (citations omitted); see Monell v. Dep't of Social Servs., 436 U.S. 658, 692 (1978) (the practice or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled policy"). Plaintiff references other court filings as evidence that Defendants knew of a staffing problem, and he refers to "Class Action John Does #1-5 v. Terry Stewart 1995-2000" (Doc. #1 at 4e ¶ 18). But without more specific facts or allegations, Plaintiff cannot show that the conditions or policies at issue in any other lawsuits were the same as those in May 2007 when he was assaulted.

In sum, Plaintiff cannot demonstrate a genuine issue of material fact concerning either the objective or subjective requirements for an Eighth Amendment claim, nor can he demonstrate liability on the part of any Defendant either personally or in their official capacity. Summary judgment will be granted to Defendants on the failure-to-protect claim

in Count I.

## V. Count II-Medical Care

### A. Legal Standard

To prevail on an Eighth Amendment medical care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). A plaintiff must show (1) a "serious medical need" and (2) that the defendant's response to that need was deliberately indifferent. Jett, 439 F.3d at 1096 (citations omitted).

A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

As stated, to act with deliberate indifference a prison official must both know of and disregard an excessive risk to inmate health. Farmer, 511 U.S. at 837. In the medical context, deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. Jett, 439 F.3d at 1096. Prison officials are deliberately indifferent to a prisoner's serious medical needs if they deny, delay, or intentionally interfere with medical treatment. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). But a delay in providing medical treatment does not constitute an Eighth Amendment violation unless the delay was harmful. Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989) (citing Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)). To establish deliberate indifference, a prisoner must show that the delay led to further injury. See Hallett v. Morgan, 296 F.3d 732, 746 (9th Cir. 2002).

"[A] mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.'" Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) (citation omitted). Therefore, to prevail on a claim involving choices between alternative

1  courses of treatment, a prisoner must show that the course of treatment the doctors chose was
2  medically unacceptable in light of the circumstances and that it was chosen in conscious
3  disregard of an excessive risk to plaintiff's health. Jackson v. McIntosh, 90 F.3d 330, 332
4  (9th Cir. 1996).

**B.      Analysis**

Defendants make no argument that the injury to Plaintiff's nose did not constitute a serious medical need, thereby satisfying the first prong of the deliberate indifference test. Estelle, 429 U.S. at 104. Thus, the summary judgment analysis turns on whether Defendants' response to Plaintiff's serious medical need was deliberately indifferent. See Jett, 439 F.3d at 1096.

Defendants submit that they were not deliberately indifferent to Plaintiff's serious medical need (Doc. #37 at 11). In support, they submit copies of Plaintiff's medical records documenting his treatment at the Maricopa Medical Center and his follow-up care at ADC (Doc. #38, Ex. E, Attachs.). According to these records and Macabuhay's declaration, Plaintiff received immediate emergency treatment for his injury and regular follow-up care upon his return to prison (id., Ex. E, Macabuhay Decl. ¶¶ 3-6). As mentioned, the emergency-room physician diagnosed a fractured nose and recommended that Plaintiff follow-up in plastics, which refers to surgery to repair the nose (id. ¶ 4, Attach. 1 at 2-5). The records show that Macabuhay filed an Outside Consult Request for a plastic surgery evaluation pursuant to that recommendation; however, Macabuhay avers that he did not think that surgery was necessary (id., Macabuhay Decl. ¶ 7). The records reflect that the denial of surgery was based on information suggesting that surgery was not necessary unless problems persisted (id. ¶ 8). And Macabuhay explains that he did not resubmit a request for surgery later because, in his opinion, the fracture was not causing Plaintiff health problems and therefore surgery was not required (id. ¶ 9).

As to Plaintiff's breathing problems, Macabuhay avers that he found those problems to be caused by allergies and asthma, and he prescribed appropriate medication and an inhaler (id. ¶¶ 9, 12). The Health Needs Requests and medical records show that each time

1  Plaintiff complained about nose pain or breathing problems, he was seen by Macabuhay for
2  evaluation, which included x-rays and renewed prescriptions (id. ¶¶ 11-18).

3  Plaintiff disagrees with Macabuhay's view that surgery was not required; however,
4  he produces no evidence to show that the surgery was medically necessary. See Hutchinson
5  v. United States, 838 F.2d 390, 393 (9th Cir. 1988) (in medical cases where the plaintiff
6  contests the type of treatment he received, an expert opinion will almost always be necessary
7  to establish deliberate indifference). The emergency-room physician's recommendation to
8  follow-up in plastics does not represent a medical conclusion that surgery was required; that
9  is, it does not establish that the failure to provide surgery was medically unacceptable. It
10 merely reflects a difference in opinion between two medical professionals, which is
11 insufficient to establish deliberate indifference. Toguchi, 391 F.3d at 1058. Plaintiff also
12 fails to submit any medical evidence to support his claim that his ongoing medical problems
13 stem from his deviated septum and not from his asthma and allergy conditions (see Doc. #1
14 at 5).

15 In short, Plaintiff falls well short of demonstrating that the course of treatment he
16 received following the injury to his nose was medically unacceptable in light of the
17 circumstances and that it was chosen in conscious disregard of a risk to his health. See
18 Jackson, 90 F.3d at 332. Thus, there is no material factual dispute concerning Macabuhay's
19 liability for deliberate indifference.

20 To the extent that Plaintiff's alleges liability by Schriro and Pratt for inadequate
21 medical care, the Court has found that the care he received was not deliberately indifferent.
22 Regardless, Plaintiff has not sufficiently set forth facts as to either Defendant's deliberate
23 indifference. See McGuckin, 974 F.2d at 1060; Shapley, 766 F.2d at 407; see also Leer, 844
24 F.2d at 634. The undisputed evidence shows that Pratt is not a licensed medical professional
25 and he had no role in providing medical care or prescribing medical treatment to Plaintiff
26 (Doc. #38, Ex. D, Pratt Decl. ¶¶ 3-4). And as the ADC Director, Schriro cannot be liable for
27 the inadequate medical care of her subordinates without actual direction or participation in
28 the treatment. See May v. Enomoto, 633 F.2d 164, 167 (9th Cir. 1980). Finally, Schriro's

and Pratt's roles in denying Plaintiff's grievances are insufficient to establish liability.

For the above reasons, summary judgment is appropriate on the medical-care claim in Count II. Defendants' motion will therefore be granted, and the Court need not address the remaining arguments concerning damages and qualified immunity.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion for Summary Judgment (Doc. #37).

(2) Defendants' Motion for Summary Judgment (Doc. #37) is **granted**.

(4) The Clerk of Court must dismiss this action and enter judgment accordingly.

DATED this 18th day of May, 2010.

_____
G. Murray Snow
United States District Judge